1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9         SOUTHERN DISTRICT OF CALIFORNIA
10

11   MATTI YOUSIF, an individual,               Case No.:  15-cv-1499 JLS (MDD)
     ELIZABETH IOANE, an individual,
12   ZACH BEIMES, an individual, and            **ORDER (1) GRANTING MOTION**
     DAWN HARRELL, an individual, on            **TO COMPEL ARBITRATION; (2)**
13   behalf of themselves and all others        **DENYING AS MOOT MOTION TO**
     similarly situated,                        **DISMISS; AND (3) STAYING**
14                                              **PROCEEDINGS**
15                          Plaintiffs,
16   v.
                                                (ECF No. 4)
17   COXCOM, LLC, a Delaware limited
18   liability company; COX
     COMMUNICATIONS CALIFORNIA
19   LLC, a Delaware limited liability
     company; and DOES 1–100,
20
21                          Defendants.
22

23        Presently before the Court is Defendants' Motion to Compel Arbitration of

24   Plaintiffs' Claims or, Alternatively, to Dismiss for Failure to State a Claim.  (ECF No. 4.)

25   Also before the Court are Plaintiffs' Opposition to Defendants' Motion, (ECF No. 8);

26   Plaintiffs' Objections to certain evidence attached to Defendants' Motion (Pls.'

27   Evidentiary Objections), (ECF No. 9); Plaintiffs' Request for Judicial Notice, (ECF No.

28   10); and Defendants' Reply in Support of their Motion, (ECF No. 11).

1

Because each plaintiff consented to an enforceable agreement to arbitrate the claims presented in this action, the Court **GRANTS** Defendants' Motion to Compel Arbitration, **DENIES** Defendants' Motion to Dismiss as Moot, and **STAYS** this action pending the resolution of arbitration.

## BACKGROUND

Plaintiffs Matti Yousif, Elizabeth Ioane, Zach Beimes, and Dawn Harrell (Plaintiffs) are current and former cable television and high speed internet customers of Defendants CoxCom, LLC and Cox Communications California, LLC (Cox).  Plaintiffs, who purport to represent themselves and others similarly situated, initiated this action in San Diego County Superior Court on May 29, 2015.  (Complaint, ECF No. 1-2.)  Cox removed this action to federal court on July 7, 2015.  (Notice, ECF No. 1.)  Plaintiffs allege that Cox unlawfully charged them an undisclosed "Advance TV" fee, and asserted eight causes of action related to that fee.  (*See* Complaint at 1; Opp'n at 8; Mot. at 7.)[1]

Cox contends that all of the Plaintiffs agreed to arbitrate any claims against it related to services Cox provided.  (Opp'n at 8.)  In particular, Cox points to its High Speed Internet Subscriber Agreement (Internet Agreement), which as of November 2011 stated:

> **YOU AND COX AGREE TO ARBITRATE – RATHER THAN LITIGATE IN COURT – any and all claims or disputes between us . . . that arise out of or in any way relate to: (1) this Agreement; (2) services that Cox provides to you in connection with this Agreement; (3) products that Cox makes available to you; (4) bills that Cox sends to you or amounts that Cox charges you for services or goods provided under this agreement and (5) any services or goods that Cox or any of its affiliated entities provide to you under any other agreement . . . . The arbitration between you and Cox will be binding and judgment on the award rendered in the arbitration may be entered in any court having jurisdiction thereof.**

(2011 Internet Agreement ¶20.1, Def.'s Ex. 3, ECF No. 4-6, at 9 (emphasis in original).)

---

[1] Page number citations to docketed materials refer to the CM/ECF number electronically stamped at the top of each page.

The 2013 Internet Agreement contained the same arbitration clause. (*See* 2013 Internet Agreement ¶20.1, Def.'s Ex. 4, ECF No. 4-7, at 11.) Of particular importance, Cox states, is section five of the arbitration clause, providing that customers agree to arbitrate claims arising from "any services or goods that Cox . . . provide[s] to you under *any other agreement*." (Mot. at 13 (quoting 2011 Internet Agreement at 9) (emphasis added).)

Plaintiffs contend that this case pertains only to an undisclosed "Advance TV" fee, and that Cox provides cable TV under the general "Terms and Conditions" Agreement (General T&C), not the Internet Agreement. (Opp'n at 8.) There is no dispute that the pertinent version of the General T&C, (2009 General T&C, Def.'s Ex. 1, ECF No. 4-4), did not include an arbitration clause.

When Cox modifies the terms in its user agreements, customers accept the new terms by continuing to use Cox services. (Mot. at 10–11.) The General T&C and Internet Agreement are available on Cox's website, and Cox mails the current version of the General T&C to customers each year. (*Id.* at 11.) Customers who began subscribing to Cox in the fall of 2012 or later received a packet containing a physical copy of the 2011 Internet Agreement. (*Id.*) For certain changes to the Internet Agreement, Cox included a "bill message" in a monthly billing statement directing customers to the updated version of the Internet Agreement. (*Id.* at 12.)

Cox first modified the Internet Agreement to include the arbitration clause quoted above in 2011. (*Id.* at 13.) The 2011 Internet Agreement also included paragraphs informing customers that they may opt out of the arbitration portion of the contract within thirty days, instructing them on how to do so, and informing them that they may continue to receive Cox services even if they opted out. (2011 Internet Agreement at 9, 11.) In 2015, shortly after receiving the demand letter that precipitated the instant action, Cox revised its General T&C to include an arbitration clause. (Opp'n at 12 n.2; 2015 General T&C, Coleman Decl. Ex. 5, ECF No. 10-3, at 5–6.) Cox also updated the Internet Agreement in 2015. (*See* 2015 Internet Agreement ¶ 20.9, Def.'s Ex. 5, ECF No. 4-8, at 16.) Those Plaintiffs who were still Cox customers timely opted out of the arbitration

provisions in both the General T&C and the Internet Agreement. (Opp'n at 14 n.4, 26–27.)

## EVIDENTIARY OBJECTIONS

"[O]n a motion to compel arbitration, a court 'may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.'" *Atlas Int'l Mktg., LLC v. Car-E Diagnostics, Inc.*, No. 5:13-CV-02664-EJD, 2014 WL 3371842, at *3 (N.D. Cal. July 9, 2014); *see also Xinhua Holdings Ltd. v. Elec. Recyclers Int'l, Inc.*, No. 1:13-CV-1409 AWI SKO, 2013 WL 6844270, at *5 (E.D. Cal. Dec. 26, 2013) ("For purposes of deciding a motion to compel arbitration, the Court may properly consider documents outside of the pleadings.") *aff'd sub nom. Clean Tech Partners, LLC v. Elec. Recyclers Int'l, Inc.*, 627 F. App'x 621 (9th Cir. 2015) (citing *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 32 (2d Cir. 2001)); *Hotels Nevada v. L.A. Pac. Ctr., Inc.*, 144 Cal. App. 4th 754, 761 (2006) ("[W]hen a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable.").

With respect to evidence relied on by the Court in this order below, the Court **OVERRULES** Plaintiffs' objections. (ECF No. 9.) Specifically, the Court finds the various service agreements attached to the declaration of Tambre Markfort admissible for purposes of this Motion. (*See* Markfort Decl., Exs. 1–5, ECF Nos. 4-4, 4-5, 4-6, 4-7, 4-8.) The Court also **OVERRULES** Plaintiffs' Objections with respect to Markfort's and Wilson's statements describing the Plaintiffs' tenure as Cox customers, (*see* Objections, ECF No. 9, at 16–27, 29–34), and considers the 2015 General T&C attached to Plaintiffs' Request for Judicial Notice, (2015 General T&C, Coleman Decl. Ex. 2, ECF No. 10-3).

## LEGAL STANDARD

The Federal Arbitration Act (FAA) governs the enforceability of arbitration agreements in contracts. *See* 9 U.S.C. § 1, *et seq.*; *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24–26 (1991). If a suit is proceeding in federal court, the party seeking

arbitration may move the district court to compel the resisting party to submit to arbitration pursuant to their private agreement to arbitrate the dispute.  9 U.S.C. § 4.  The FAA reflects both a "liberal federal policy favoring arbitration agreements" and the "fundamental principle that arbitration is a matter of contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted); *see also Kilgore v. Keybank, Nat'l Ass'n*, 718 F.3d 1052, 1057 (9th Cir. 2013) (en banc) ("The FAA was intended to overcome an anachronistic judicial hostility to agreements to arbitrate, which American courts had borrowed from English common law.") (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 n.14 (1985)); *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002) ("The [FAA] not only placed arbitration agreements on equal footing with other contracts, but established a federal policy in favor of arbitration, [citation], and a federal common law of arbitrability which preempts state law disfavoring arbitration.").

In determining whether to compel a party to arbitration, the Court may not review the merits of the dispute; rather, the Court's role under the FAA is limited to "determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008).  If the Court finds that the answers to those questions are yes, the Court must compel arbitration.  *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

In determining the validity of an arbitration agreement, the Court applies state law contract principles.  *Adams*, 279 F.3d at 892; *see also* 9 U.S.C. § 2.  To be valid, an arbitration agreement must be in writing, but it need not be signed by the party to whom it applies as acceptance may be implied in fact.  *Pinnacle Museum Tower Ass'n v. Pinnacle Market Development (US), LLC*, 55 Cal. 4th 233, 236 (2012).  Further, "[a]n arbitration clause within a contract may be binding on a party even if the party never actually read the clause."  *Id.*

## ANALYSIS

For purposes of whether Plaintiffs must, in fact, arbitrate these claims, the

dispositive questions are (1) whether the arbitration clause in the Internet Agreement covers this dispute and, if so, (2) whether that clause is otherwise enforceable.

## I.   The Arbitration Clause in the Internet Agreement Covers Plaintiffs' Claims

Plaintiffs contend that the arbitration clause contained in the Internet Agreement does not cover their Advance TV fee claims, and even if it did at one point, the arbitration clause in the 2015 General T&C—which several Plaintiffs opted out of—superseded the Internet Agreement's arbitration provision.  (Opp'n at 9–14.)  The Court finds that the language of the arbitration clause contained in the Internet Agreement encompasses Plaintiffs' Advance TV fee claims and remains operative as to that claim despite the 2015 amendments to the General T&C and Internet Agreement.

### A.   *Scope of Internet Agreement's Arbitration Clause*

Plaintiffs argue that the Arbitration Clause in the 2011 Internet Agreement cannot be read to apply to cable TV services because the Internet Agreement, by its own terms, pertains only to the provision of high speed internet services.[2]  (Opp'n at 12–14.)  The document begins by stating "[t]his Subscriber Agreement . . . sets forth the terms and conditions under which CoxCom, Inc. . . . agrees to provide Cox® High Speed Internet(sm) service . . . to you,"  (2011 Internet Agreement at 2), and does not refer to "cable" or "television" anywhere in the document, (*see id.*).

Cox points out that the General T&C expressly refers to and incorporates the Internet Agreement through a provision stating, "[i]f you receive Cox's High Speed Internet Service, You will also be bound by the Cox High Speed Internet Subscriber Agreement." (Reply at 4 (citing General T&C at 2).)  Reading this pair of contracts as Cox suggests, a customer who subscribes only to TV services would be free to litigate this dispute in court, whereas a customer who subscribes to both cable TV and high speed internet services would be required to arbitrate disputes arising from cable TV services.  Although peculiar,

---

[2] Plaintiff Beimes also agreed to a 24-month price lock agreement for the provision of cable TV services that contained an arbitration clause.  (*See* Reply at 3.)

1  there is no reason parties cannot contractually agree to this arrangement.

2          Despite the stated purpose of the 2011 Internet Agreement—which is clearly focused

3  on high speed internet services—it contains a clause that unambiguously requires

4  arbitration for claims that relate to "*any services* or goods that Cox or any of its affiliated

5  entities provide to you under *any other agreement*." (*Id.* at 9 (emphasis added).) The same

6  paragraph also mentions "services that Cox provides to you in connection with *this*

7  *Agreement*." (*Id.* (emphasis added).) There can be little doubt that this arbitration clause—

8  even though nested in an agreement geared toward high speed internet—encompasses

9  claims arising from Cox's provision of cable TV services. *See United Steelworkers of Am.*

10 *v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 584–85 (1960) ("In the absence of any express

11 provision excluding a particular grievance from arbitration, we think only the most forceful

12 evidence of a purpose to exclude the claim from arbitration can prevail, particularly where,

13 as here, the exclusion clause is vague and the arbitration clause quite broad."); *see also*

14 *Dental Associates, P.C. v. Am. Dental Partners of Michigan, LLC*, 520 F. App'x 349, 354

15 (6th Cir. 2013) ("[T]he express limitation in the arbitration provisions in the APA and the

16 Employment Agreements to 'disagreements and controversies arising with respect to this

17 Agreement' demonstrates that the parties intended these provisions to apply to the

18 agreements in which they appear and not the Service Agreement.")

19         Plaintiffs also contend that Cox does not even think the Internet Agreement

20 arbitration clause covers this claim, as evidenced by the fact that soon after Plaintiffs sent

21 Cox their demand letter Cox "scrambled to change its 2009 General T&C to include an

22 arbitration clause, class action waiver provision, and jury waiver provision and told

23 customers that it would be doing so." (Opp'n at 13.) It is not surprising, however, that

24 Cox would amend its General T&C to more clearly deal with claims related to cable TV

25 services even if it believed that the 2011 Internet Agreement terms already required

26 arbitration in this situation. If that clause existed in the 2009 General T&C, Cox could

27 have avoided several pages of argument in these moving papers, if not this Motion or this

28 lawsuit altogether. Cox's adding this term to the 2015 General T&C does not compel a

conclusion that Cox's 2011 Internet Agreement does not require arbitration for claims related to cable TV services.

### B.   *Effect of 2015 Contract Amendments*

Plaintiffs also argue that the Internet Agreement cannot be read to encompass these cable TV-related claims because it would make the opportunity to opt out of the 2015 Internet Agreement illusory.[3]  (Opp'n at 14.)

The Court agrees with Plaintiffs that, for the opt-out provision of the 2015 Internet Agreement to have any effect, the arbitration clause in the 2015 Internet Agreement must in some way supersede the arbitration clauses in the Internet Agreements from prior years. And reading the clause as Cox suggests, it does in fact supersede that clause, but only for claims arising after the 2015 General T&C took effect.

The 2015 Internet Agreement contains another clause—the Order of Precedence Clause—which makes the interrelation between the opt-out provision and the arbitration clauses in the various agreements explicit.  The Order of Precedence Clause states:

> [I]f you are required to arbitrate any claim or dispute that arises out of or relate[s] in any way to any Services provided to you by Cox or any of its affiliated entities under any other agreement with Cox prior to the effective date of this Agreement ("Prior Agreement"), the dispute resolution terms contained in the Prior Agreement shall control with respect to those Services. Otherwise, the dispute resolution terms contained in this Agreement shall control.

(2015 Internet Agreement ¶ 20.9, at 16.)  This provision contemplates arbitration clauses from prior versions of the Internet Agreement, and states that they continue to control for the time periods in which those agreements governed.  It tells customers they may opt out of arbitration moving forward, but it does not allow customers to retroactively nullify the arbitration clause that governed the parties' relationship at the time the dispute arose.  (*See*

---

[3] Notably, Plaintiffs Ioane and Harrell were no longer Cox customers when the 2015 Internet Agreement was issued, and therefore could not have opted out.  (Reply at 2–3.)  Instead, at that point the "survival" provision in the 2011 and 2013 versions of the Internet Agreement dictates that those Plaintiffs remain bound by the arbitration clause.  (*Id.* at 3.)

*id.*)  The Order of Precedence Clause is not invalid simply because it may represent clever contract drafting aimed at this very situation.  To the contrary, it shows that the parties to the contract—realistically just Cox, who drafted the contract—contemplated this very situation and attempted to make the result clear.  To reject the Order of Precedence term, customers would have to discontinue their Cox subscriptions, in which case the survival clauses would still require arbitration.

Plaintiffs offer no alternative explanation for what the Order of Precedence clause might mean and offer no authority that would allow the Court to simply ignore the clause.  (*See* Opp'n at 25–26.)  Under California contract law principles, the Court "must interpret contractual language in a manner which gives force and effect to *every* provision, and not in a way which renders some clauses nugatory, inoperative or meaningless."  *See City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 473 (1998) (emphasis in original), *as modified on denial of reh'g* (Jan. 6, 1999).

For the same reason, Plaintiffs' integration clause argument is unpersuasive.  Although the 2015 Internet Agreement states that it is "the entire agreement and understanding between the parties with respect to its subject matter and supersedes and replaces any and all prior written or oral agreements," (2015 Internet Agreement at 17), the 2015 Internet Agreement itself refers back to and incorporates the "Prior Agreements," (*Id.* at 16 ("[T]he dispute resolution terms contained in the Prior Agreement shall control.").

Thus, the Court finds that the arbitration clause in the Internet Agreement covers claims related to the allegedly unlawful Advance TV fee.

## II.   The Arbitration Clause in the Internet Agreement is Enforceable

Plaintiffs suggest that Cox cannot include an arbitration clause in the Internet Agreement that "is in no way constrained by the subject matter of the agreement in which the arbitration clause is located."  (Opp'n at 15.)  Plaintiffs propose three "approaches" courts have taken "in rejecting arguments like" this, suggesting the Court could conclude: (1) that the Internet Agreement is not an "umbrella agreement"; (2) that Cox's proposed construction would render the clause unconscionable; or (3) that Cox did not provide

9

sufficient notice of the scope of the clause for Plaintiffs to consent to arbitration of cable TV-related claims. (Opp'n at 15–24.) For the reasons discussed below, these arguments are unpersuasive, and the Court concludes that the arbitration clause in the Internet Agreement is enforceable.

### A.    *Umbrella Agreement*

Plaintiffs argue the Sixth Circuit's "umbrella agreement" inquiry is instructive here, and encourage the Court to ask, first, "did the agreement containing the arbitration clause create the relationship between the parties," and second, "would the claims actually asserted in the action necessarily refer to that agreement?" (Opp'n at 15 (citing *Dental Associates*, 520 Fed. App'x at 349).) In addition to the *Dental Associates* case, the Sixth Circuit followed this approach in *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 502–04 (6th Cir. 2007) ("[T]his case requires us to determine the scope of an arbitration clause where parties have entered into multiple contracts as part of one overall transaction or ongoing relationship.").

In *Nestle*, the Sixth Circuit held that, even though a dispute arose from a deed that did not contain an arbitration clause, a separate contract nonetheless compelled arbitration of the dispute. *Id.* at 503. While the *Nestle* court noted the strong policy favoring enforcement of arbitration clauses, it nonetheless emphasized the importance of the parties having agreed to such a clause. *Id.* at 503–04. Part of that analysis involved asking whether the suit could be maintained without reference to the agreement containing the arbitration clause. *See id.* at 505. The court held that maintaining the suit in that case would require the court to look to the agreement containing the arbitration clause, weighing in favor of arbitration. *Id.* at 505–06. The Court then inquired into the intent of the parties using contractual interpretation principles. *Id.* at 506–08.

Plaintiffs primarily rely on *Dental Associates*, an unpublished Sixth Circuit case in which the court held that, although that action could not proceed without reference to the agreement containing the arbitration clause, the contract containing the arbitration clause suggested the parties did not intend for it to encompass that dispute. 520 Fed. App'x 352–

10

54.  The *Dental Associates* court found it significant that the agreement in that case was one that might typically contain an arbitration clause, yet it did not, whereas the deed in *Nestle* typically would not contain an arbitration clause.  *See id.* at 353–54.

Preliminarily, the Court notes that, even if the out-of-circuit *Nestle* and *Dental Associates* cases counseled against finding the instant dispute within the scope of the arbitration clause in the Internet Agreement, the Supreme Court's unmistakably clear statements favoring arbitration carry more weight.  *See e.g.*, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (U.S. 1983) ("The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.").  The Court is not persuaded, however, that the Sixth Circuit's analysis would require the Court to conclude that this claim is outside the scope of the arbitration clause.  Although the allegedly unlawful Advance TV fee could likely be carried forward without referring to the Internet Agreement, the *Nestle* and *Dental Associates* inquiry would require turning next to the parties' intent.  *See Nestle*, 505 F.3d at 505; 520 Fed. App'x at 354.  Here the language drafted by Cox, and to which Plaintiffs apparently consented, unambiguously refers not only to internet services, but to any services Cox or its affiliates provide.  By contrast, in *Dental Associates*, in which the court did not compel arbitration, the arbitration clause at issue included "the express limitation . . . to 'disagreements and controversies arising with respect to *this Agreement*.'"  520 Fed. App'x at 354 (emphasis added).  Given the clear language in the Internet Agreement in this case, the possibility of proceeding on these claims without otherwise referencing the Internet Agreement does not mean the arbitration clause contained in the Internet Agreement is invalid as applied to the Advance TV fee.[4]

---

[4] Notably, the Plaintiffs do not cite a case applying the "umbrella agreement" test that actually invalidates a clause in another contract, as would be the case here.  (*See* Opp'n at 15–17.)

11

1      **B.    *Unconscionability***

2          Plaintiffs next argue that reading the arbitration clause in the 2011 and 2013 versions

3   of the Internet Agreement to reach this claim would render the term unconscionable.

4   (Opp'n at 19.)   Cox aptly points out that Plaintiffs' argument relates only "'surprise' or

5   'procedural' unconscionability," and that Plaintiffs make no effort to show substantive

6   unconscionability.  (Reply at 5.)

7          To make a case for unconscionability under both California and Nevada law, a party

8   must show both procedural and substantive unconscionability.  *See D.R. Horton, Inc. v.*

9   *Green*, 120 Nev. 549, 553–54 (2004) ("[L]ess evidence of substantive unconscionability is

10  required in cases involving great procedural unconscionability."); *Armendariz v.*

11  *Foundation Health Pyschcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000).   Procedural

12  unconscionability involves oppression or surprise flowing from "unequal bargaining

13  power." *Armendariz*, 24 Cal. 4th at 114.  "A clause is procedurally unconscionable when

14  a party lacks a meaningful opportunity to agree to the clause terms either because of

15  unequal bargaining power, as in an adhesion contract, or because the clause and its effects

16  are not readily ascertainable upon a review of the contract." *D.R. Horton*, 120 Nev. at 554.

17  A term may be surprising—and therefore potentially procedurally unconscionable—when

18  it is "hidden in a prolix printed form drafted by the party seeking to enforce the disputed

19  terms." *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 486 (Ct. App. 1982).

20         Substantive unconscionability exists when a contract has "overly harsh or one-sided

21  results." *Armendariz*, 24 Cal. 4th at 114 (internal citations omitted).  The "ultimate issue

22  in every case is whether the terms of the contract are sufficiently unfair, in view of all

23  relevant circumstances, that a court should withhold enforcement." *Sanchez v. Valencia*

24  *Holding Co., LLC*, 61 Cal. 4th 899, 912 (2015).  Further, "the standard for substantive

25  unconscionability—the requisite degree of unfairness beyond merely a bad bargain—must

26  be as rigorous and demanding for arbitration clauses as for any contract clause." *Id.*

27         The unconscionability analysis under Arizona law is more compact, but largely

28  similar: "Factors showing substantive unconscionability include 'contract terms so one-

12

sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity.'" *Harrington v. Pulte Home Corp.*, 211 Ariz. 241, 252 (Ct. App. 2005) (citing *Maxwell v. Fid. Fin. Servs., Inc.*, 184 Ariz. 82, 89 (1995)).

Plaintiffs have not shown substantive unconscionability, so this Court lacks discretion to refuse to enforce this term on unconscionability grounds. *See D.R. Horton*, 120 Nev. at 554; *Armendariz*, 24 Cal. 4th at 114. The arbitration clause in the Internet Agreement provided for a neutral third-party arbitrator from the American Arbitration Association, and Cox promised not to "Seek to recover its fees and costs from you in the arbitration unless your claim has been determined to be frivolous." (2011 Internet Agreement at 10–11.) Cox agreed to "pay all filing fees and costs for commencement of an arbitration," and agreed to pay the customer's reasonable attorney's fees and costs if the customer prevails. (*Id.* at 11.) Further, Cox agreed to pay an additional $5,000 above the arbitration award to any customer who obtains an "award from the arbitrator greater than Cox's last written settlement offer . . . ." (*Id.*) It seems that an individual customer with a meritorious claim against Cox actually stands to gain more from arbitration at less expense than traditional litigation. (*See id.* at 10–11.) Of course, Cox may be counting on claims such as this being worthwhile to customers—or perhaps their attorneys—only when pursued as class actions. While Plaintiffs' concern is a valid one, the Court cannot say that these arbitration terms are substantively unfair as applied to these Plaintiffs.

The Court is cognizant that procedural unconscionability is interconnected with substantive unconscionability, such that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz*, 24 Cal. 4th at 114. Although there is some merit to Plaintiffs' argument that a provision pertaining to arbitration of cable TV services might be surprising in an agreement focused on high speed internet services, the Court is not convinced that this provision is procedurally unconscionable. First, these services are typically bundled, such that a customer would

order them together and pay for them together.  (*See* Reply at 7.)  It is not difficult to imagine a customer thinking of these services jointly, with a modem, router, and cable TV box bunched together on the same entertainment center.  As Cox points out, these "services are physically delivered to the customer together, with common customer service resources for billing and technical issues for both services."  (*Id.*)  Given that, a clause pertaining to cable TV services in the Internet Agreement is not as surprising as Plaintiffs suggest.

Second, the arbitration clause and opt-out provision in the 2011 Internet Agreement are the only paragraphs set entirely in bold typeface.  (*See* 2011 Internet Agreement at 9.) The term complained of is, therefore, not "hidden in a prolix printed form."  *See A & M Produce Co.*, 135 Cal. App. 3d at 486.  The opt-out provision is even more conspicuous than the arbitration clause, set entirely in capital letters.  (*See id.*)  It is true that, as provided by Cox in the attachment to its Motion, these paragraphs are on page eight of eleven.  (*Id.*) But to a potential customer skimming through the agreement, this paragraph is particularly conspicuous, and fairly clearly suggests that, if the customer is to read any paragraph, this capitalized, bold-faced section may be worthwhile.  (*See id.*)

Finally, Cox made opting out relatively easy.  Unlike many contracts of adhesion, customers could opt out of the arbitration clause but continue to receive Cox services.  (*See id.* at 11 ("Exercising this right, should you choose to do so, will not affect any of the other terms of this Agreement or other contracts with Cox and you may remain a Cox customer.").)  The contract provided thirty days to opt out, and a mailing address to which customers could send an opt-out notice.  (*Id.*)  Further, opting out in that instance would carry forward to future contracts, so customers would not be required to opt out again.  (*Id.*)

Even assuming Plaintiffs would not have expected to find an arbitration clause pertaining to cable TV services in the Internet Agreement, it is difficult to imagine that these customers decided they were willing to arbitrate any claims arising from Cox's provision of high speed internet services—as none of the Plaintiffs timely opted out of the 2011 and 2013 Internet Agreements—but not cable TV services.  Put differently, assuming a customer was subjectively aware of the requirement to arbitrate high speed internet

14

claims and was content not to opt out, it seems unlikely a customer would have opted out if he or she were subjectively aware that the clause also required arbitration of cable TV claims. Plaintiffs' "surprise" arguments are therefore unconvincing.

Consequently, the arbitration clause in the Internet Agreement is neither substantively nor procedurally unconscionable.

### C.    *Notice and Consent*

Plaintiffs contend that, to the extent the arbitration clause in the Internet Agreement covers disputes arising from Cable TV services, Plaintiffs did not consent to arbitration. (Opp'n at 20.) That is, because customers reviewing the Internet Agreement would have expected it only to apply to internet services, the arbitration clause as it pertains to cable TV services is outside the scope of what they consented to. (*See* Opp'n at 23.)

Defendants respond that the arbitration clause was in no way hidden, and that they had no obligation to highlight if for their customers.[5] (Reply at 8.) Cox further points out that it provided "repeated, express notice of the dispute resolution provisions" by sending messages along with customers' bills in the spring of 2012 about the 2011 Internet Agreement and customers' right to opt out, as well as a "Welcome Kit" for new customers in the Fall of 2012 that included the then-current Internet Agreement. (Reply at 8.)

For largely the same reasons that the Court found the arbitration clause neither substantively nor procedurally unconscionable, the Court finds that the Plaintiffs had sufficient notice and consented to this term. Plaintiff cites *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (Ct. App. 1972), for the proposition that, "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." (Opp'n at 21.) Even if this provision could be considered inconspicuous, the contractual nature of the Internet Agreement is obvious.

---

[5] Even without such an obligation, Cox arguably did highlight it for their customers, as mentioned above, because the arbitration provisions are the only paragraphs set entirely in bold typeface.

As stated above, Cox provided simple procedures for customers to opt out, and the language pertaining to Cox services more broadly—juxtaposed against language pertaining solely to high speed internet services—would send customers diligent enough to review the contract a clear message that the parties agree to arbitrate any claim that arises out of the bundle of services Cox provides.  There can be little doubt that customers consented to this arbitration clause as it pertains to high speed internet services.  It would defy common sense to suppose that, had customers read the terms carefully and realized that not only high speed internet, but also cable TV and telephone services were subject to arbitration, that they would have opted out of the arbitration clause.  A reasonable consumer seeking to avoid binding arbitration with Cox would have at least read the bolded section of a contract titled "DISPUTE RESOLUTION; ARBITRATION; CLASS ACTION WAIVER" and "YOU AND COX AGREE TO ARBITRATE," and which pertained to some part of the bundle of services he received from Cox.  Accordingly, the Court is not convinced that Plaintiffs did not consent to this term.

## III.   Motion to Dismiss

In light of the Court's conclusion that the arbitration clause in the Internet Agreement covers the claims alleged in this action and is enforceable, the Court does not reach Cox's Motion to Dismiss.

**CONCLUSION**

For the reasons stated above, the Court concludes that the arbitration clause contained in the Internet Agreement encompasses Plaintiffs' claims related to the Advance TV fee and is enforceable.  Accordingly, the Court hereby **GRANTS** Cox's Motion to Compel Arbitration and **DENIES AS MOOT** Cox's Motion to Dismiss.  (ECF No. 4.)

Furthermore, pursuant to the FAA, the Court **STAYS** the judicial proceedings pending the outcome of any arbitration.  *See* 9 U.S.C. § 3 ("If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to

16

arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."); *Martin Marietta Aluminum, Inc. v. Gen. Elec. Co.*, 586 F.2d 143, 147 (9th Cir. 1978) (holding that courts shall order a stay of judicial proceedings "pending compliance with a contractual arbitration clause").

    **IT IS SO ORDERED.**

Dated:  March 21, 2016

Hon. Janis L. Sammartino
United States District Judge